**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Stephen Kelly Keogan,

Plaintiff,

Civ. No. 02-865 (RHK/JSM)
**MEMORANDUM OPINION AND ORDER**

v.

Towers, Perrin, Forster & Crosby, Inc., et al.,

Defendants.

---

Fay E. Fishman, Peterson & Fishman, P.L.L.P., Minneapolis, Minnesota for Plaintiff.

Richard G. Rosenblatt and James P. Walsh, Jr., Morgan Lewis & Bockius, L.L.P., Princeton, New Jersey, and Brian G. Belisle, Oppenheimer, Wolff & Donnelly, L.L.P., Minneapolis, Minnesota, for Defendant Towers, Perrin, Forster & Crosby, Inc.

---

## Introduction

Plaintiff Stephen Kelly Keogan brought this action against Defendant Towers, Perrin, Forster & Crosby, Inc. ("Towers") for the restoration of long-term disability ("LTD") benefits and for the imposition of a penalty due to Towers's failure to supply requested plan documents.[1] Towers provides LTD benefits to its employees under a self-funded welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). Keogan began receiving LTD benefits in December 1992. In 2000,

---

[1] Keogan also sued Intracorp and Kemper National Services, the former and current third-party administrators to the Plan. Keogan has agreed to dismiss them from the suit.

FILED MAY 0 9 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 0 9 2003
DEPUTY CLERK

Towers evaluated his continued eligibility and determined that he was no longer "long-term disabled" within the guidelines of the LTD plan. After fifteen months of correspondence between Keogan's counsel and Towers, in which Keogan's counsel repeatedly asked for a complete copy of Keogan's file and a copy of the LTD plan documents, Keogan filed an appeal with Towers from the termination of his benefits. In support of that appeal, Keogan relied in part on a determination by the Social Security Administration ("SSA") that he has been totally disabled since May 1992. Towers never responded to Keogan's appeal, and this lawsuit followed.

Towers has asserted a counterclaim for an accounting and the recovery of LTD benefits that it claims Keogan should not retain because they "overlap" with disability insurance benefits that the SSA paid to Keogan retroactively for the period from June 1999 to May 15, 2000. Towers seeks a constructive trust on those funds. Presently before the Court are the parties' cross motions for summary judgment. For the reasons set forth below, the Court will grant in part each motion.

## Background

### I. The LTD Plan at Issue

Towers is a Pennsylvania corporation whose principal place of business is Philadelphia, Pennsylvania. Effective January 1, 2000, the "Towers Perrin Company Paid Benefit Plans For US Employees" (hereinafter, "the January 1, 2000 Document") constituted the "Plan document" for several "Company Paid Benefit Plans" (including the

LTD Plan) that Towers made available to its American employees.[2] (App. to Def.'s Mem. in Supp. of Summ. J. ("Def.'s App."), Ex. E at D0104-05.) The January 1, 2000 Document expressly provided that it "supercedes any and all prior plan documents and merges the plans contained herein into one plan." (Id. at D0104.)

The January 1, 2000 Document designates Towers as the "Plan Administrator" and "Named Fiduciary" of the Company Paid Benefit Plans. (Id. at D0110.) Pursuant to the January 1, 2000 Document, the Human Resources Committee of Towers's Board of Directors ("the Committee") handles "the general administration of the Plans on behalf of the Company as Plan Administrator." (Id.) The Committee has "full power, authority and discretion to administer the Plans and to construe and apply all of its provisions on behalf of the Employer." (Id.) The Committee's powers and duties include "[d]eciding questions relating to eligibility, continuity of employment, and amounts of benefits. Benefits under the Plans will be paid only if the Committee decides in its discretion that the applicant is entitled to them." (Id.)

The January 1, 2000 Document sets out a claim procedure for the payment of benefits under the Plans. Regarding an appeal from the denial of benefits, the January 1, 2000 Document states:

---

[2] The January 1, 2000 Document defines "Company Paid Benefit Plans" as the following five plans: (a) the Business Travel Accident Insurance Plan; (b) the Basic Life Insurance Plan; (c) the Long Term Disability Plan; (d) the Employee Assistance Plan; and (e) the Tuition Reimbursement Plan. (Id. at D0105.)

> If the claimant wishes to appeal the denial, the claimant or a duly authorized representative will file a written request with the committee for a review. This request must be made by the claimant within sixty (60) days after receiving notice of the claim's denial. The claimant or representative may review pertinent documents relating to the claim and its denial, may submit issues and comments in writing to the Committee *and may request a hearing*. Within sixty (60) days after receipt of such a request for review, the Committee shall reconsider the claim (*and if the claimant shall have so requested, and the Committee has determined that a hearing is appropriate, shall afford the claimant or his representative a hearing before the Committee*) and make a decision on the merits of the claim. . . . The decision on review will be in writing and include specific reasons and references to the pertinent Plan provisions on which the decision is based. All interpretations, determinations, and decisions of the Committee in respect of any claim shall be made in its sole discretion on the applicable Plan documents and shall be final, conclusive and binding on all parties.

(Id. at D0112-13 (emphasis added).)

With respect to the form of benefit and the maximum benefits payable under the Plans, the January 1, 2000 Document refers to an "Answer Book," the full title of which is the "Answer Book: A Towers Perrin Guide to TotalPay." (Id. at D0109; see also id. at D0105 (defining the "Answer Book").) The Answer Book describes itself as "a summary plan description of all Towers Perrin employee benefit plans" as required under ERISA. (Def.'s App., Ex. D at 194, 198 (the Towers "Answer Book").) It also provides that, for certain benefit plans, including the LTD Plan, the information contained in the Answer Book "also comprises *part of* the official plan document, which, in addition to any applicable insurance contract, would govern in all cases." (Id. (emphasis added).)

According to the Answer Book, an employee becomes eligible for LTD benefits after twenty-six weeks of continuous disability. (Id. at 108.) LTD benefits are paid until

the employee either recovers from the disabling illness or injury or reaches normal retirement age. (Id. at 105.)

> To maintain eligibility for LTD benefits, you must be unable to perform each and every duty of *your* job for the first 130 weeks you are disabled. To continue to receive benefits after this period, you must be
>
> ✦Unable to perform *any* job for which you are reasonably suited based on your education, training and experience
>
> AND
>
> ✦Under the continuing care of a licensed medical practitioner.

(Id. at 108 (emphasis in original).) LTD benefits will be reduced "by 100% of your primary Social Security benefit and any other statutory disability payments you might receive." (Id. at 109.) Coverage for disability benefits ends when the employee terminates his or her employment with Towers Perrin, is no longer eligible to participate in the Plan, or the Plan terminates. (Id. at 111.)

The "Disability" section of the Answer Book refers to the "Administrative Information" section for "details about the administration of this plan – including how to appeal a claim." (Id. at 111.) That section describes the appeal process as follows:

> If your claim for a benefit is denied in whole or in part, you (or your beneficiary) will be notified in writing by the administrator for that benefit plan. This written notice will include:
>
> ✦ Specific reason(s) for the denial
>
> ✦ References to plan provision(s) on which the denial is based
>
> ✦ A description of any additional material or information that is necessary to perfect the claim

> ✦ Procedures for appealing the decision.
>
> You or your authorized representative may review all documents related to any denial of benefits. If you disagree with the plan administrator's decision, you have 60 days from the receipt of the original denial to request a review. This request should be in writing and sent to HR Administration at the following address . . . .

(Id. at 194.)

## II. Keogan's Claim for LTD Benefits

### A. The onset of Keogan's disability

Keogan began working for Towers Perrin as an actuary in January 1989.[3] In the fall of 1990, he spent time with his family in a wooded area along the St. Croix River. (Def.'s App., Ex. B at D0059 (Administrative Record).) After that visit, he removed several ticks from himself and, although he had no rash, he experienced some joint pains within days to weeks of the incident. (Id.)

The joint pain subsequently disappeared, and Keogan was fine until March 1991, when he and his family returned from a trip to Hawaii. (Id.) Both Keogan and his wife, along with several of their children, developed chills, myalgias, and joint pain in the knees, ankles, and hands. (Id.) All of the family recovered except for Keogan, who continued to have persistent chills, sweats, bouts of diarrhea, headaches, severe joint pain without swelling, and fatigue. (Id.) Keogan, "who used to be highly active prior to that,

---

[3] In his job, Keogan used complicated math formulae and computer input to determine premiums for HMOs. (App. to Def.'s Mem. in Supp. of Summ. J., Ex. B at D0087 (Administrative Record).)

started having to sleep up to 12 hours or more a day with a nap in the afternoon." (Id.)

Beginning in July 1991, Keogan began to miss significant amounts of work due to illness. (Id. at D0096-97.) He used all of his short-term disability benefits for 1991 and 1992, and took an unpaid leave of absence in the spring of 1992. (Id. at D0094.) Towers thereafter extended Keogan's short-term disability benefits pending his qualification for LTD benefits. (See id. at D0090-91, D0098.) Keogan's salary in 1992, as of the last day he worked, was $33,900.00 per year. (Id. at D0030, D0076.)

**B. Keogan receives LTD benefits**

In December 1992, a representative of Intracorp, the then-administrator of the Plan, met with Keogan, his wife, and Dr. Robert Tierney, a rheumatologist. Intracorp made an initial evaluation of Keogan's claim, reporting that Dr. Tierney had diagnosed Keogan as having fibrositis, a problem affecting the connective tissue components of muscles, tendons, and ligaments. (Id. at D0086-87.) "Pain and fatigue are the common limiting symptoms, accompanied by sleep disorder." (Id.)

On December 30, 1992, Towers sent a letter notifying Keogan that he had been approved to received LTD benefits retroactive to November 13, 1992. (Id. at D0030; see also id. at D0070, D0075.) The letter advised Keogan that his semi-monthly benefit of $847.50 would "be offset by any primary Social Security or other governmental benefits you may be eligible to receive." (Id. at D0030.) Towers also advised Keogan that, if he was still disabled when he reached his "Normal Retirement Date" of January 1, 2017, his

LTD benefits would be replaced by benefits from the Towers Perrin Retirement Income Plan. (Id.)

In February 1994, Keogan underwent an independent medical examination ("IME") by Dr. Elliot Francke, who evaluated Keogan's ability to return to work. (Id. at D0057-62.) Keogan told Dr. Franke that his joint pain had resolved, but he experienced a reoccurrence of severe fatigue after two good weeks in December. (Id. at D0058.) Keogan also reported that eating fruit or foods with carbohydrates caused diarrhea and severe abdominal cramping, and brought a recurrence of his other symptoms, including joint pain. (Id. at D0060.) Work-ups and bowel studies did not reveal any specific abnormalities. (Id.) Based on the sleep schedule Keogan reported to him, Dr. Francke concluded that Keogan could not work more than one or two hours a day at that time. (Id. at D0062.) Dr. Francke noted that this conclusion was "based entirely upon what the patient himself tells me and not the results of objective physical findings." (Id.)

On March 7, 1994, Intracorp reported to Towers that Dr. Francke was of the opinion that Keogan had chronic fatigue syndrome ("CFS") and might also have problems associated with candida (i.e., a form of yeast overgrowth). (Id. at D0053.) Two months later, Intracorp told Towers that Keogan had been treating with a Dr. Sehnart for candida and fatigue and, while there had been some improvement for the yeast infection, there had been virtually no improvement with the fatigue problem. (Id. at D0050.)

On August 4, 1994, Intracorp sent another report to Towers regarding Keogan's

LTD claim. (Id. at D0040.) Intracorp noted that Keogan was in the "own occupation" phase of the disability coverage, which constitutes the first 130-week period of his coverage. (Id.) Intracorp observed that the "any occupation" phase of the Plan's coverage would begin in May 1995 and, at that point, it might be appropriate to reassess Keogan's status. (Id.) Intracorp coded Keogan's disability as "myalgia and myositis NOS." (Id.)

In the summer of 1995, Towers asked Intracorp to reopen Keogan's file and obtain an update regarding his employability. (Id. at D0027.) On August 31, 1995, Susan Burton of Intracorp wrote to Dr. Allan Kind, Keogan's treating physician and a doctor in the infectious diseases clinic at Park Nicollet, regarding Keogan's employability. (Id. at D0035.) Burton indicated that Keogan had told her that his fatigue, joint pain, and digestive problems had been improving recently, but had returned after he completed a course of antibiotics for shigella. (Id.) Burton reported that Keogan also said he experiences a severe increase in symptoms (especially debilitating fatigue) the day after trying to increase activities. (Id. at D0029.) Burton asked for Dr. Kind's opinion as to whether Keogan could return to work and, if so, what limitations might be appropriate. (Id.)

On October 27, 1995, Intracorp reported to Towers that Keogan had seen Dr. Kind on October 25, 1995. Dr. Kind had confirmed a diagnosis of CFS, opining that Keogan remained disabled from all work due to the cognitive and exertional limits associated with CFS. (Id. at D0024-25.) Intracorp suggested that Towers consider helping Keogan apply

for Social Security disability insurance, cautioning that Keogan might have difficulty in obtaining Social Security benefits, given his age and educational level. (Id. at D0026.)

### C. Keogan Undergoes an IME in 2000

There appears to have been no activity on Keogan's LTD file until January 2000, when Towers sent a letter to Keogan advising him that he would have to undergo an IME to confirm his continued disability status. (Id. at D0021.) Intracorp scheduled an examination with Dr. Thomas Jetzer, an occupational and environmental medicine physician, on March 21, 2000. (Id. at D0022.)

Dr. Jetzer interviewed Keogan and performed a physical examination; he also reviewed Keogan's medical history from May 1991 forward. From this information, Dr. Jetzer prepared an eleven-page report. (Id. at D0009-19.) Keogan told Dr. Jetzer that he has been off work because of "chronic fatigue syndrome or fibromyalgia." (Id. at D0009.) Keogan indicated that "he has been simply too tired and fatigued to do any work." (Id.) Dr. Jetzer reported that Keogan said

> he is still having symptoms at this point in time, and he can only stay up for 12 hours a day. He states he has been spending the last eight years staying home taking care of his children while his wife works as an operating room nurse at Abbott Northwestern Hospital on a full-time basis. . . . He says if he does any exercise or strenuous activities, he feels it for three days after that. He says he cannot drive long distances. His wife still drives him because he feels he cannot concentrate. He denied any other symptoms except joint pain and fatigability.
>
> On review of systems, Mr. Keogan said he occasionally had some headaches. He cannot specify any other symptoms. He has no ongoing diarrhea, he has no chest or cardiac symptoms, and he has no urinary tract problems.

(Id. at D0010.) Keogan also said that he had not seen his physicians often. (Id.) "He says he is not receiving any active treatment at this point in time. He denies being treated for depression per se, but rather for chronic fatigue syndrome." (Id.)

More than half of Dr. Jetzer's report is a review of Keogan's medical records. (Id. at D0011-16.) Two-thirds of that review concerns visits Keogan made to health care providers before he began receiving long-term disability benefits. (See id. at D0011-14.) Dr. Jetzer reports that, after Keogan was approved for LTD benefits in late December 1992, he made the following visits to health care providers:

| | | |
|---|---|---|
| June 10, 1993 | Dr. Kind | Reports deep aching (made better by exercise), tiredness, sleep disorder (for which he sees Dr. Smith), and irritable bowel syndrome. |
| June 21, 1993 | Dr. Smith | Concludes that Keogan has non-apneic respiratory disturbances while sleeping. |
| Oct. 11, 1993 | Dr. Kind | Reports that his fatigue was improving and, with exercise, his achiness was virtually gone. Keogan is taking essentially no medication. |
| February 1994 | Dr. Allen | Treatment for acne. |
| Feb. 22, 1994 | Dr. Kind | Discussed a potential yeast problem after his independent medical examination with Dr. Francke. Dr. Kind felt there was no basis for taking an antifungal agent, but concurred in prescription Dr. Francke had given Keogan. |
| Oct. 17, 1994 | Dr. Sevenich | Treatment for irritable bowel syndrome. |
| May 9, 1995 | Dr. Kind | Reported that most of his joint pain was gone and that he had eliminated eating grains. |

| | | |
|---|---|---|
| | | Keogan's drowsiness was also better. |
| Oct. 25, 1995 | Dr. Kind | Reports that he is having headaches when he looks at bright lights. Keogan had been feeling better in the summer, but did not feel good in the fall. He was doing light housework, but reported that it was troublesome. Keogan stated that he did not think he was ready to go back to work.[4] |
| Nov. 5, 1995 | dermatologist | Treatment for a cyst involving the tubule where sperm is stored. |
| Jan. 2, 1997 | Dr. Kind | Reports he is functioning pretty much as a hermit. Dr. Kind ordered more tests and felt that Keogan still had chronic fatigue syndrome. An exercise program for the joint pain and fatigability was recommended. |
| Sept. 17, 1997 | Dr. Birnbaum | Seen for left shoulder pain that the doctor determined to be a strain of the fascia surrounding muscle tissue. The doctor recommended that Keogan take Motrin on an as-needed basis. |
| Oct. 8, 1997 | dermatologist | Seen for hand warts. |
| January 1998 | dermatologist | Seen for a benign tumor-like overgrowth of tissue involving the skin cells that synthesize melanin. |
| Dec. 23, 1999 | Dr. Kind | Reports that he has no endurance and cannot do much without getting tired. Keogan had been prescribed a thyroid medication. |

[4] The results of this office visit were reported to Susan Burton at Intracorp.

(Id. at D0014-16.)[5] Dr. Jetzer stated that his examination of Keogan showed signs of joint pain, but that Keogan was in no acute distress. (Id. at D0016-17.) The physical examination was otherwise unremarkable.

From the foregoing, Dr. Jetzer concluded that Keogan's case was "somewhat complex." (Id. at D0017.) Dr. Jetzer first considered Keogan's diagnosis and, then addressed his functional capacity. On the question of diagnosis, Dr. Jetzer noted some evidence of gastrointestinal problems, but concluded that it did not reach the level of colitis. (Id.) "The chief diagnosis that has continued to be made, although not substantiated, is some type of fatigability/ fibromyalgia." (Id.)

> In terms of medical diagnoses, in my opinion, Mr. Keogan does not fit the diagnosis of fibromyalgia. There has been a persistent basis in all the medical records that his problems have been one of joint pain. It is interesting to note that Mr. Keogan did get better with exercise and was doing quite well. Furthermore, the fatigability that occurred, while initially present, may have been exacerbated in an iatrogenic fashion [that is, unintentionally, as a result of treatment] by the number of medications.

(Id. at D0017-18.) Dr. Jetzer concluded that Keogan has no symptoms or findings of fibromyalgia on examination.

Dr. Jetzer further concluded that Keogan's case presented other concerns. He

---

[5] Dr. Jetzer's recitation of Keogan's treatment history does not include a May 26, 1998 visit to Dr. Chris Foley for the treatment of gastrointestinal problems which resulted in a course of treatment that included taking supplements to help with bacterial imbalances and digestive abnormalities. (Fishman Aff. Ex. at Bates No. 1045.) Nor does it include Keogan's visit in February 1997 to Dr. George Kramer, a physician in the physical medicine clinic, who set up an exercise program for Keogan to address his CFS and joint pain. (Id. at Bates No. 1108.)

observed that, whereas Keogan told him that he can be up only twelve hours a day, he has been able to raise three children – at that time, ages 13, 9, and 5 – while his wife worked full-time as an operating room nurse. (Id. at D0018.) To Dr. Jetzer, that fact indicated an ability to do some level of activity.

> [W]hile it sounds like there were legitimate complaints initially, I am concerned this case may have slipped into factors of secondary gain by about two years. It appears that this may have also been affected possibly by the medical treatment that he received, including the sedative medications as well as lack of encouragement to strongly participate in an exercise program that increases activity level. Clearly, Mr. Keogan has been able to raise children for the last nine years, with his wife being gone, and still receiving disability payments. Clearly, that is an advantage to their family and while I cannot state this was the basis for the original complaints, it may have been a reason to continue to maintain . . . this disability status. . . . It appears he has become comfortable in his role in rearing their children and not working, and I suspect there is going to be a great deal of reluctance in moving him from this position. His wife supports his continued complaints and what role she plays in this whole disability status in uncertain to me as well.

(Id. at D0018-19.) Dr. Jetzer recommended that Keogan could return to work on a full-time basis; he further recommended that Keogan see an endocrinologist to review his thyroid problems, and that Intracorp consider a psychiatric evaluation of Keogan to see if there is resistance in returning to work. (Id. at D0019.)

**D. Towers terminates Keogan's LTD benefits.**

On April 25, 2000, Ashwyn Diljohn, Towers's Benefits Manager in Philadelphia, sent Keogan a letter stating that his LTD benefits were being terminated because he was "no longer considered long-term disabled within the guidelines of the Towers Perrin LTD

plan." (Id. at D0004.) The letter notified Keogan that he would receive his final LTD payment from Towers on May 15, 2000, and his healthcare benefits would end on May 30, 2000. (Id.) The letter advised Keogan that he could apply for Social Security disability benefits and his Intracorp case manager could help him with the paprwork (Id.)

On May 1, 2000, Intracorp sent Towers a report on Keogan's LTD claim, noting Dr. Jetzer's concern that Keogan's case "may have slipped into factors of secondary gain by about two years." (Id. at D0006.) Intracorp also focused in its report on Dr. Jetzer's observation that Keogan had been able to raise children for nine years, while his wife worked full-time, and still receive disability benefits. (Id.)

On May 16, 2000, Keogan sent a letter to Ted Lyle, his former manager at Towers's offices in Minneapolis (id. at D0005), also sending a copy to Diljohn. (Id. at D0001-03.) Keogan told Lyle about his IME with Dr. Jetzer and that the Philadelphia office had discontinued his LTD benefits. (Id. at D0001.) Keogan stated that Intracorp "had difficulty finding a doctor that would agree to conduct the examination because of the controversial diagnosis." (Id.) He voiced several complaints with the IME:

> The examination spanned two ten-minute segments. The physician dissipated time asking questions that could have been answered by previewing the abundant records I provided. The examination proceeded with minimal sharing of information. My concern over the physician's lack of interest, objectivity and thoroughness was noted and reported to case manager Cindi Barnes. Her response was to wait for the report.

(Id.) Keogan told Lyle he did not accept Dr. Jetzer's conclusion and stated that he was interested in resolving this matter "differently,"asking whether there were any "creative

alternatives" Towers could offer to accommodate employees in his situation. (Id.)

Keogan saw Dr. Kind on May 18, 2000. (Fishman Aff. Ex. at Bates No. 1096; see also id. at 1045.) It appears that Keogan showed Dr. Jetzer's letter to Dr. Kind; Dr. Kind records in the file: "[Keogan] brought me that note. I reviewed it, and basically it was a recounting of the notes in our charts with some comments about [Keogan] directly." (Id. at 1096.)

> The issue at hand is whether or not [Keogan] is disabled. That is a very subjective assessment. What [Keogan] does describe is fatigue, which is increased with exercise. If he does too much, he will be virtually wiped out the next day. He gets some headaches. He has lots of achiness, but he says this is better since he got off grains. He has difficulty with concentration, especially if he is fatigued. He is describing something with a cold now in his hands that suggests he may have some Raynaud's phenomena.[6]

(Id.) Dr. Kind notes that he discussed Keogan's situation with him at length and "he said he did not think he could go back to full-time work but that he would be 'willing to attempt part-time work.'" (Id.) Dr. Kind noted that he would "write a 'to whom it may concern' letter verifying my assessment of his ability to work." (Id.) Dr. Kind also noted that he did not know whether Keogan could tolerate part-time work: "I think if there is a way he could start out working possibly two or three hours on Monday, Wednesday and

---

[6] Raynaud's phenomenon is defined as "intermittent bilateral attacks of ischaemia [i.e., a low oxygen state caused by inadequate blood flow] of the fingers or toes . . . marked by severe pallor and often accompanied by paraesthesia [i.e., abnormal sensations such as burning or prickling] and pain, it is brought on characteristically by cold or emotional stimuli and relieved by heat and is due to an underlying disease or anatomical abnormality." Dep't of Medical Oncology, University of Newcastle upon Tyne, On-line Medical Dictionary, <http://cancerweb.ncl.ac.uk/cgi-bin/omd?action=Home&query=>

Friday and slowly work up, he could find out what his abilities are." (Id.) Shortly after this visit, Dr. Kind retired and was no longer available to write to Towers regarding Keogan's health status. (Keogan Aff. ¶ 6.) Keogan began a treating relationship with a new doctor. (Id.)

On June 13, 2000, Keogan's attorney, Fay Fishman, wrote to Diljohn requesting a complete copy of Mr. Keogan's file. (Def.'s App., Ex. F.)

> By complete copy I mean all medical records in your possession, all forms and applications completed by Mr. Keogan and his physicians, all internal memoranda regarding his claim, *a copy of his policy of long term disability, and all plan documents regarding his claim for long term disability.* The complete copy should further include any records or notes from any physician, vocational person, nurse, or any other professional who reviewed this matter at your request or on your behalf.

(Id. (emphasis added).) Fishman also requested a copy of Dr. Jetzer's curriculum vitae. (Id.) Finally, Fishman asked for a sixty-day extension of Keogan's appeal time, to start after she received a copy of the requested documents. (Id.) When Fishman heard nothing from Towers after one month, she sent a follow-up letter to Diljohn. (Fishman Aff. Ex. at Bates No. 1001.)

Diljohn responded in writing on August 4, 2000. (Def.'s App. Ex. G at D0117-19.) Diljohn's letter stated it was "intended to serve as the ERISA claims denial letter in accordance with section 503 of ERISA," and that, effective May 15, 2000, Keogan was no longer entitled to receive LTD benefits "based upon the results of the independent medical exam performed by Thomas C. Jetzer, M.D., which concludes that (1) Mr.

Keogan is not under the continuing care of a licensed medical practitioner and (2) Mr. Keogan is no longer disabled within the meaning of the LTD Plan." (Id. at D0117.)

> The LTD Plan provides that to maintain eligibility for LTD benefits, you must be unable to perform each and every duty of your job for the first 130 weeks you are disabled. To continue to receive benefits after this period, you must be unable to perform any job for which you are reasonably suited based on your education, training, and experience and under the continuing care of a licensed medical practitioner. (Page 108, Towers Perrin Answer Book.)
>
> There is no additional information that the Administrator has identified that would perfect Mr. Keogan's claim.

(Id.) Diljohn stated that Keogan could "appeal this determination, in accordance with the claims appeals procedures located on page 194 of the Towers Perrin Answer Book, within 60 days from the receipt of this letter." (Id. at D0117-18.) Diljohn noted that she had enclosed a release that

> must be executed by Mr. Keogan before we can forward his file to you. In addition, we note that Mr. Keogan has been provided a copy of the extensive report of Dr. Jetzer. You will need to contact Dr. Jetzer directly to obtain a copy of his curriculum vitae.
>
> We have also enclosed a copy of the Towers Perrin Answer Book which provides the terms of the LTD Plan.

(Id. at D0118.)

### E. Keogan's Application for Social Security Disability Benefits

On July 24, 2000, Keogan applied for Social Security disability benefits. (Fishman Aff. Ex. at Bates Nos. 1023-73.) On October 26, 2001, an administrative law judge ("ALJ") issued an opinion finding that Keogan met "the statutory criteria for a finding of

disability at all times since May 15, 1992, his alleged onset date of disability." (Fishman Aff. Ex. at Bates No. 1249.) A neutral medical expert testified before the ALJ that Keogan's report of symptoms has remained virtually unchanged since 1991 and, together with physical examination findings, are most consistent with a diagnosis of CFS. (Id. at 1250.) The ALJ found Keogan to have been limited by CFS since May 15, 1992 and restricted to performing no more than sedentary level work, but not on a regular and continuing basis. (Id.) Ultimately, the ALJ concluded that Keogan was unable to perform any work existing in significant numbers in the national economy. (Id. at 1251.) The SSA paid Keogan a lump sum award for disability insurance benefits retroactive to June 1999, and has paid Keogan benefits on an ongoing basis. (See Keogan Aff. ¶ 8; Def.'s App., Ex. A at 6, 9 (Joint Rule 26 Report).)

### F. Keogan's Appeal of the Termination of LTD Benefits

On August 15, 2000, Fishman forwarded to Diljohn a Release of Information form signed by Keogan. (Fishman Aff. Ex. at Bates No. 1002.) Fishman asked that she be given sixty days from the date she received a copy of Keogan's file to appeal Towers's termination of benefits, as opposed to sixty days from the August 4, 2000 letter. (Id.) Fishman also advised Diljohn that no copy of the Answer Book had been enclosed with her notice letter of August 4, 2000; Fishman asked Diljohn to send her a copy of the Answer Book. (Id.) On October 18, 2000, Fishman wrote again to Diljohn: "I have not had a response from you to my letter of August 15, 2000. May I please hear from you in

the immediate future." (Fishman Aff. Ex. at Bates No. 1003.)

On November 14, 2000, Towers sent something to Fishman by facsimile, although the record is unclear as to what was sent. In response to that facsimile, Fishman wrote to Diljohn again, complaining that Towers

> continue[s] to persist in failing to provide me with a **complete** copy of Mr. Keogan's file. . . . A complete file includes all medical records, memorandum, independent medical surveillance reports, as well as a copy of the insurance policy/ERISA plan documents. You have now twice told me you have sent me a complete copy of the file. This is not complete as the medical records are not enclosed.

(Def.'s App. Ex. H. (emphasis in original).) Fishman reiterated that Keogan planned to appeal the termination of his benefits and asserted that "it is impossible for him to do so without seeing a complete copy of the information you have gathered on him." (Id.)

On November 21, 2000, Diljohn wrote to Fishman, stating that a complete copy of Keogan's disability file had been placed in overnight mail on November 9, 2000. (Def.'s App., Ex. I.) Diljohn further stated:

> Intracorp administers our third party independent medical exams. They provide to us a report, a copy that is contained in Mr. Keogan's file. You must contact them directly for any additional information. *The Answer Book constitutes our plan document.* Mr. Keogan should have a copy in his possession. Please contact me if you need an additional copy.

(Id. (emphasis added).)

Approximately four months later, in a letter dated March 5, 2001, Fishman advised Diljohn that, to date, she still had not received any medical records or the Answer Book.

> I have spoken with people at Intracorp and EvaluMed and have been told

> that the responsibility lies with you to provide those records. Under ERISA law you must provide us with the records that your denial was based upon. Neither Intracorp nor EvaluMed have those records and, even if they did, they have no authority to release them to us. . . . The vitae we requested from Dr. Jetzer also needs to be requested by you.

(Def.'s App. Ex. J.) Fishman again wrote to Diljohn on April 10, 2001, complaining that Towers had "referred us to Intracorp to get a copy of [Keogan's] file, who have only referred us back to you for the file." (Fishman Aff. Ex. at Bates No. 1004.) Towers did not respond in writing to Fishman's letters of March 5 and April 10, 2001.

On November 8, 2001, Fishman filed an appeal with Towers from the termination of Keogan's LTD benefits; in support thereof, she submitted Keogan's entire SSA disability file, including the ALJ's favorable determination. (Def.'s App. Ex. K.) On February 26, 2002, Fishman wrote to Diljohn, stating that Towers had exceeded the sixty days in which it was required to respond to an appeal; Fishman demanded that Towers respond to the appeal within ten days of her letter. (Fishman Aff. Ex. at Bates No. 1005.) Keogan filed suit on April 24, 2002.

## Analysis

### I. Standard of Decision

Summary judgment is proper if, assuming all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show the existence of specific facts that create a genuine issue for trial. See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

Towers seeks summary judgment on the two counts asserted against it in Keogan's Complaint – the count alleging the termination of LTD benefits, and the count alleging that Towers failed to provide requested LTD plan documents. For his part, Keogan seeks the entry of judgment in his favor both on his claims against Towers and on Towers' counterclaim. The Court begins with Towers's alleged failure to provide plan documents.

## II. Imposition of a Penalty for Failure to Produce Plan Documents

ERISA requires a plan administrator, upon the written request of any participant or beneficiary, to provide a copy of "the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, contract, *or other instruments under which the plan is established or operated*." 29

U.S.C. § 1024(b)(4) (emphasis added). "If within thirty days a plan administrator 'fails or refuses to comply with a request' from a participant for information that the administrator is required by ERISA to furnish, the court has discretion to award the participant statutory damages of up to $100 per day for each day of violation." Wilson v. Moog Automotive, Inc. Pension Plan and Trust for U.A.W. Employees, 193 F.3d 1004, 1010 (8th Cir. 1999) (quoting 29 U.S.C. § 1132(c)(1)(B)). The purpose of ERISA's statutory penalty is to punish noncompliance. Chesnut v. Montgomery, 307 F.3d 698, 704 (8th Cir. 2002) (citations omitted). Thus, the plan administrator's good faith and the absence of harm to the beneficiary are relevant in deciding whether to award a statutory penalty. Id.

Towers asserts that, because the LTD plan is a "wrap plan," the Answer Book contains all of the provisions relevant to a participant's claim or appeal for benefits. (Def.'s Mem. Supp. Mot. for Summ. J. at 16.) Towers does not cite to, nor has this Court found, any binding case law addressing the production of plan documents for "wrap plans." In any event, the record belies Towers's argument. The Answer Book itself states that, for the LTD plan, the information it contains comprises only *part of* the official plan document. (Def.'s Aff. Ex. D at 194, 198.) Although the January 1, 2000 Document provides that a participant may request a hearing before the Human Resources Committee of Towers's Board of Directors as part of his or her appeal (Def.'s Aff. Ex. E at D0112-13), the Answer Book makes no reference to the opportunity for a hearing in connection

with an appeal.[7] Finally, the Answer Book obviously is not the sole "instrument under which the plan is established or operated," see 29 U.S.C. § 1024(b)(4), in that it makes no reference to the Committee's powers and duties with respect to the general administration of the LTD plan, unlike the January 1, 2000 Document. (See id. at D0110-11.)

There is, at best, a genuine issue of fact as to whether or when Towers sent the Answer Book to Keogan's counsel. Even assuming, however, that Towers sent Fishman the Answer Book on August 4, 2000, as Towers asserts it did, that is not enough. It is undisputed that Towers never sent Keogan or his counsel a copy of the January 1, 2000 Document, despite the fact that, by its own terms, it was *the* Plan document in effect when Towers reconsidered Keogan's eligibility for benefits. (Def.'s Aff. Ex. E at D0104.). Towers has not substantiated a good faith reason why it never sent Fishman a copy of the January 1, 2000 Document. As for the harm arising from the failure to send Keogan or his counsel a copy of the January 1, 2000 Document, Keogan has argued that he would have sought a hearing before the Committee had he known that such an opportunity existed. The Court concludes that this failure to provide relevant information regarding the procedures for redressing a denied claim constitutes harm to Keogan.

Towers's failure to send a copy of the Plan document -- the instrument under which

---

[7] Thus, it is doubtful that the Answer Book constitutes an adequate "summary plan description." Subsection (b) of § 1022 provides that a summary plan description shall contain, *inter alia*, information regarding "the remedies available under the plan for the redress of claims which are denied in whole or in part ...." 29 U.S.C. § 1022(b).

the LTD plan was established or operated at the time Towers decided to terminate Keogan's benefits -- is punishable under 29 U.S.C. § 1132(c). Keogan first requested the "plan documents" through counsel on June 13, 2000. Pursuant to § 1132(c)(1)(B), Towers had thirty days to respond to that request. Thus, the period of non-compliance begins on July 14, 2000. Neither Keogan nor his counsel received the January 1, 2000 Document until sometime after this lawsuit commenced on April 24, 2002. Using the filing date of this action as a conservative ending date, the period of non-compliance with Keogan's request for plan documents is 649 days.

Section 502(c)(1) of ERISA states that the fine for an administrator's failure to provide requested information shall be "in the amount of up to $100 a day." 29 U.S.C. § 1132(c)(1). Based on Towers's inexcusable failure to provide Keogan with a copy of the January 1, 2000 Document (despite at least three requests from Keogan's counsel for all plan documents), and in light of the erroneous assertion in Diljohn's November 21, 2000, letter that the Answer Book was the plan document, the Court determines that a maximum daily penalty is warranted. At the rate of $100 per day, Towers has garnered a fine of $64,900. The Court will grant Keogan's motion and deny Towers's motion with respect to Keogan's claim for a statutory penalty under ERISA.

## III. Towers's Decision to Terminate Keogan's LTD Benefits

### A. Standard of Review

An ERISA plan participant may bring a civil suit "to recover benefits due to him

under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Supreme Court has held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "The decision to confer discretion on an ERISA plan administrator affects both the rights of plan participants and beneficiaries, and the administrator's burden to assemble an adequate claims record and to adequately explain its decision at the administrative level." Walke v. Group Long Term Disability Ins., 256 F.3d 835, 840 (8th Cir. 2001).

The January 1, 2000 Document states that the Human Resources Committee of the Towers Board of Directors has "full power, authority and discretion to administer the Plans and to construe and apply all of its provisions on behalf of the Employer," and that the Committee's powers include "[d]eciding questions relating to eligibility, continuity of employment, and amounts of benefits." (Def.'s App. Ex. E at D0110.) The January 1, 2000 Document further provides that "[b]enefits under the Plans will be paid only if the Committee decides in its discretion that the applicant is entitled to them."[8] (Id.) The

[8] In light of this express language in the operative Plan document -- the January 1, 2000 Document -- the Court rejects Keogan's argument that an abuse of discretion standard does not apply because *the Answer Book* does not grant discretion over benefit eligibility. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 13-15.)

Court concludes that this language plainly gives the administrator the discretion both to determine eligibility for benefits and to construe the terms of the plan.

Keogan argues that the Court must evaluate Towers's actions under a standard of review less deferential than the "abuse of discretion" standard for two reasons. First, Keogan contends that Towers forfeited any right to a deferential standard of review by delegating the authority to determine plan eligibility to Intracorp and the IME doctor. (Pl.'s Mem. at 15-18.) Alternatively, Keogan asserts that Towers operated under a palpable conflict of interest and that serious procedural irregularities existed in the processing of his claim. (Id. at 18-20.) The Court considers each argument in turn.

**1. Delegation of authority**

Keogan argues that Towers has waived the right to benefit from a favorable standard of review under Bruch because it delegated its authority to determine LTD eligibility to third parties. Keogan contends that Towers hired Intracorp to be the third-party administrator of its LTD claims and gave Intracorp full authority to choose the doctor who conducted the IME. Keogan complains that Towers did not confirm that Intracorp chose an appropriate doctor and did not confirm that the medical records gathered by Intracorp were complete. Keogan further complains that no one from Towers reviewed Keogan's medical records, relying instead solely on the opinion of the IME doctor to determine Keogan's continued eligibility for benefits. (See Pl.'s Mem. at 16.)

Keogan relies principally on 29 U.S.C. § 1105(c), which addresses the allocation

of an ERISA fiduciary's responsibilities:

> The instrument under which a plan is maintained *may expressly provide for procedures* (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) *for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.*[9]

29 U.S.C. § 1105(c)(1) (emphasis added).[10] Keogan contends that any delegation Towers made to Intracorp regarding administration of LTD claims is legally insufficient because "[t]he Towers plan contains no provision allowing for the delegation of authority." (Pl.'s Mem. at 18.) The record does not support that assertion.

The January 1, 2000 Document allows the Committee to "designate agents to carry out responsibilities relating to the Plans, other than fiduciary responsibilities." (Def.'s App. Ex. E at D0110.) The Committee hired Intracorp to gather medical records, retain a

---

[9] For purposes of subsection (c) of 29 U.S.C. § 1105, "the term 'trustee responsibility' means any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan, other than a power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with § 1102(c)(3) of this title." 29 U.S.C. § 1105(c)(3).

[10] A person is a "fiduciary" with respect to an ERISA plan "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 20 U.S.C. § 1002(21)(A). The language in the January 1, 2000 Document granting discretionary authority and discretionary control to the Human Resources Committee of the Towers Board of Directors establishes that the Committee wears the hat of a "fiduciary." See Johnston v. Paul Revere Life Ins. Co., 241 F.3d 623, 632 (8th Cir. 2001) ("Discretion is the benchmark for fiduciary status under ERISA pursuant to the explicit wording of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)") (internal quotation marks omitted).

doctor to perform an IME, and submit the medical records to that IME physician. Keogan has offered no authority establishing that those tasks fall within the scope of "fiduciary responsibilities."[11] Thus, there is no genuine issue of material fact as to whether Towers impermissibly delegated fiduciary duties to Intracorp. As for Towers's reliance on the independent examining physician's report, which included a review of medical records gathered from Keogan's treating physicians, Keogan has not established that the consideration Towers gave to Dr. Jetzer's report constituted an abdication of the plan administrator's fiduciary duties. See Smith v. UNUM Life Ins. Co., 305 F.3d 789, 795 (8th Cir. 2002). Keogan has not demonstrated, as a matter of law, that Towers delegated its discretionary power to determine his continued eligibility for LTD benefits.

### 2. A palpable conflict of interest or serious procedural irregularity

Keogan alternatively contends that, even if Towers had (and did not delegate) the discretionary authority to determine his eligibility for LTD benefits, Towers is not entitled to a deferential standard of review under Bruch because Towers was operating under a conflict of interest and there were serious procedural irregularities in the handling of his claim. A court will review a plan administrator's decision to deny benefits under a less deferential standard where the plan beneficiary presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or serious procedural irregularity

---

[11] Nor has Keogan presented probative evidence establishing a genuine issue of material fact as to whether Dr. Jetzer was qualified to perform the IME.

existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to him." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). Not only must the evidence be material and probative, but the alleged conflict or procedural irregularity must be tied to the denial of benefits. Id. at 1161. Furthermore, the plaintiff must offer evidence that "gives rise to serious doubts as to whether the result reached was the product of an arbitrary decision or the plan administrator's whim." Layes v. Mead Corp., 132 F.3d 1246, 1250 (8th Cir. 1998) (internal quotation marks omitted).

The Court need not decide whether, or to what extent, to deviate from the abuse-of-discretion standard of review because, on the facts of this case, any standard produces the same result.

**B. Keogan's Continued Eligibility for LTD Benefits**

It is undisputed that, after the initial 130 weeks of long term disability, one is eligible for LTD benefits under Towers's plan only if (1) he or she is "unable to perform any job for which you are reasonably suited based on your education, training, and experience" *and* (2) he or she is "under the continuing care of a licensed medical practitioner." (Def.'s App. Ex. D at 108.) Towers cited Keogan's failure to satisfy both requirements as its reason for terminating his LTD benefits. (Id. Ex. G at D0117.) The parties do not dispute that the failure to satisfy *either* criteria would result in the termination of LTD benefits. The Court considers each criterion in turn.

Since at least 1994, Keogan's treating physician, Dr. Kind, diagnosed him as

having CFS. (See Fishman Aff. Ex. at Bates Nos. 1107-09, 1113-14, 1116.) Both Dr. Kind and Intracorp's previous IME doctor, Dr. Francke, reported a diagnosis of CFS to Intracorp, who in turn relayed that diagnosis to Towers. (Def.'s App. Ex. B at D0024-25, D0053). Dr. Jetzer's analysis does not address this diagnosis at all, focusing instead only on the diagnosis of fibromyalgia. This omission from Dr. Jetzer's report is significant.

Nothing in the record suggests that CFS is not a recognized medical condition. On the contrary, the Centers for Disease Control and Prevention of the United States Department of Health and Human Services ("CDC"), has had written criteria for the diagnosis of CFS since at least the late 1990s. See *CDC -- Chronic Fatigue Syndrome*, <www.cdc.gov/ncidod/diseases/cfs/> (2003); DuMond v. Centex Corp., 172 F.3d 618, 622 (8th Cir. 1999) (affirming administrator's consideration of and reliance upon independent physician's report where physician compared claimant's medical records to CDC's criteria for CFS). Nowhere in his eleven-page report does Dr. Jetzer compare Keogan's then-existing physical condition, ascertained by a direct examination, or Keogan's medical records to the CDC criteria for CFS. Instead, Dr. Jetzer -- who is not a psychologist -- questions whether Keogan suffers from depression and opines at some length about the possibility that Keogan's behavior is motivated by secondary gain.

Having failed to consider Keogan's diagnosis of CFS, Dr. Jetzer did not proceed to the second step of his analysis and evaluate Keogan's functional capacity in light of that diagnosis. Dr. Jetzer's took no account of Keogan's principal diagnosis and, hence, failed

to inquire into the relevant circumstances of Keogan's medical condition. Absent this relevant information and analysis, Towers could not -- and did not -- exercise reasonable judgment in deciding to terminate Keogan's LTD benefits based on a failure to satisfy the "unable to perform any job" component of continued eligibility for LTD benefits. See Buttram v. Central States, Southeast & Southwest Areas Health and Welfare Fund, 76 F.3d 896, 900 (8th Cir. 1996). Even under a deferential standard of review, Towers's reliance on Dr. Jetzer's functional capacity assessment, given the repeated references in Keogan's disability file to CFS, does not pass muster.

Towers argues that it nevertheless properly terminated Keogan's benefits because he did not satisfy the plan's requirement of being "under the continuing care of a licensed medical practitioner." The record indicates that Keogan saw Dr. Kind, the infectious diseases physician treating him for CFS, on the following occasions: October 25, 1995; January 2, 1997; and December 23, 1999. (Fishman Aff. Ex. at Bates Nos. 1097, 1109, and 1113.) Following Keogan's last review for LTD benefit eligibility, therefore, the gap between doctor visits was approximately fourteen months and approximately thirty-six months, respectively.[12] At the IME, Keogan told Dr. Jetzer that he had not seen his physicians often and was not receiving any active treatment for his condition at that time. (Def.'s App. Ex. B at D0010.)

---

[12] Even if one includes Keogan's visit to Dr. Kramer, the physical medicine physician, in mid-February 1997 for an exercise plan (see Fishman Aff. Ex. at Bates No. 1107), the gap between his last two appointments would be about *thirty-four* months.

"Continuing care" is not defined or explained in the Answer Book. Both parties cite to ERISA cases in which the long-term disability plan requires "the regular attendance of a physician," Rowan v. UNUM Life Insurance Co., 119 F.3d 433, 434 (6th Cir. 1997), or requires the LTD beneficiary to be under "the regular care of a physician," Walke, 256 F.3d at 838, or "the regular and personal care of a physician," Conway v. Paul Revere Life Insurance Co., No. Civ. 5:99CV150-T, 2002 WL 31770489 at *2 (W.D.N.C. Dec. 5, 2002), or "a doctor's regular care for the cause of his or her total disability," Rosenberg v. The Guardian Life Insurance Co., No. 00 Civ. 8198 DLC, 2002 WL 31885930 at *1 (S.D.N.Y. Dec. 27, 2002). In ordinary parlance, "continuing" entails the concept of proceeding without interruption. Merriam-Webster Online Dictionary (10th ed.), <www.m-w.com> (defining "continuing" as "to maintain without interruption a condition, course, or action"); see also, Webster's Third International Dictionary at 493-94 (1986) (defining "continuing" as equivalent to "continuous," which is defined as "characterized by uninterrupted extension in time or sequence: continuing without intermission or recurring regularly after minute interruptions").

Keogan argues that "[w]here there is no evidence that additional doctor visits would have influenced the progression of the disability, there can be no claim that the claimant was not under the regular care of a physician." (Pl.'s Mem. at 26 (citing Walke.) He contends that there is no evidence suggesting that seeing a doctor more often would

have benefitted him.[13] (Pl.'s Mem. at 27.) Keogan's medical records belie this argument.

In January 1997, Dr. Kind referred Keogan to Dr. Kramer in the physical medicine clinic for an exercise program that might ameliorate his joint pain and fatigue. Over a month later, Keogan met with Dr. Kramer, who directed that Keogan try certain stretching exercises, recommended that he start a pool exercise program, and prescribed an anti-inflammatory medication. (Fishman Aff. Ex. at Bates No. 1107.) Dr. Kramer also observed that other anti-inflammatories and/or Zoloft for sleep might help Keogan's condition. (Id.) Although Dr. Kramer's notes discuss a follow-up visit in six to eight weeks (id.), Keogan's records do not indicate that he saw Dr. Kramer again. Keogan's records do reflect, however, that earlier exercise programs had produced some benefit with Keogan's fatigue and achiness. (Id. at Bates Nos. 1114, 1116, 1119.)

Even under the most liberal standard of review – a *de novo* review in which the Court considers all documents, including those submitted in support of Keogan's appeal – Towers's determination that Keogan was not under the "continuing care of a licensed medical practitioner" would stand. It is undisputed that Keogan did not follow up with Dr. Kramer on the course of treatment he prescribed and did not return to Dr. Kind for almost three years. The Walke and Rowan cases on which Keogan relies are

---

[13] Keogan avers that his treating doctors told him there is no treatment for his CFS other than what he had been doing and that he need only return for problems. (Keogan Aff. ¶ 4.) Keogan's averment as to what his doctors told him, offered for the truth of the assertion that there is no treatment for Keogan's CFS and he did not need to return unless there were "problems," is inadmissible and cannot create a genuine issue of material fact.

distinguishable. Towers shall be affirmed in its termination of Keogan's LTD benefits on the grounds that he did not satisfy the plan's "continuing care" requirement.

## IV. Towers's Counterclaim for a Constructive Trust

Keogan moves for summary judgment on Towers's counterclaim on the grounds that it runs counter to the Supreme Court's recent decision in Great-West Life & Annuity Insurance Co. v. Knudson, 122 S. Ct. 708 (2002). Keogan argues that, to the extent Towers's counterclaim seeks "to enforce a contractual obligation for the payment of money, a classic action at law and not an equitable claim," (Pl.'s Mem. at 33), it is not authorized by § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Furthermore, to the extent Towers seeks a constructive trust, Keogan contends that Towers must identify particular funds in Keogan's possession that rightfully belonging to Towers. Keogan asserts that such tracing is impossible because he has long since spent both the funds he received from Towers and the retroactive lump-sum payment received from the SSA.

Towers responds that its counterclaim for an accounting and constructive trust is consistent with Great-West in that it is alleging that Keogan is "holding particular funds that, in good conscience, belong" to it. Great-West, 122 S. Ct. at 714-15. It asserts that the "res" in this case is the award of Social Security payments Keogan has received *and is continuing to receive on a monthly basis*. (See Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 15.) The Court finds two problems with Towers's argument.

Towers's sweeping definition of the purported trust "res" is inconsistent with the

allegedly wrongful conduct that purportedly gives rise to a constructive trust, and is contrary to the language quoted above from Great-West. The "windfall" to Keogan was a portion of the SSA's retroactive payment of disability insurance benefits – that portion attributable to the period from June 1999 through May 15, 2000. Towers has come forward with no evidence calling into question Keogan's sworn statement that he spent all of the money received from the SSA as the retroactive payment of disability insurance benefits. Towers has not presented any financial documents showing what Keogan did with that retroactive award payment when he received it, or showing whether those funds were (or were not) either commingled or consumed. There is no genuine issue of material fact as to whether a trust "res" presently exists.

Second, nothing before the Court establishes that the Social Security disability payments Keogan will receive for May 2003 and subsequent months are themselves a "windfall" to Keogan. He applied for Social Security disability benefits *after* Towers informed him that it was terminating his LTD benefits. His entitlement to receive Social Security disability payments in 2003 is independent of any rights or obligations he owes Towers under the LTD plan. The Court concludes that it would be inequitable to deprive Keogan of future Social Security disability payments, particularly where, as here, Towers cannot demonstrate that Keogan possesses identifiable funds that have been wrongfully retained. The Court will grant Keogan summary judgment on the counterclaim.

**Conclusion**

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED** that

(1) Defendant Towers, Perrin, Forster & Crosby, Inc.'s Motion for Summary Judgment (Doc. No. 11) is **GRANTED IN PART** with respect to Count One of the Complaint, alleging a wrongful termination of long-term disability benefits.

(2) Plaintiff Stephen Kelly Keogan's Motion for Summary Judgment (Doc. No. 14) is **GRANTED IN PART** with respect to Count Two of the Complaint, alleging a failure to supply requested plan documents, and Towers's Counterclaim for the imposition of a constructive trust. Towers's Counterclaim is hereby **DISMISSED WITH PREJUDICE**.

(3) On Count Two of the Complaint, Plaintiff Stephen Kelly Keogan shall have and receive from Defendant Towers, Perrin, Forster & Crosby, Inc. the sum of sixty-four thousand nine hundred dollars ($64,900.00).

(4) Counts Three and Four of the Complaint against Defendants Intracorp and Kemper National Services, respectively, are **DISMISSED WITH PREJUDICE** and without costs, based on the stipulation of the parties.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

May 9, 2003

RICHARD H. KYLE
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*